Pleased to be seen. Will you call the next case, please? 3-11-0-6-7-1. Brian J. Wegerer, et al., announced by Daniel Churchill v. Michael Porubcin, et al., at the Louis J. St. Paul. Mr. Churchill. Yes, sir. Thank you. May it please the Court, Council of Record, parties that may be present this afternoon. My name is Dan Churchill, Mark Churchill, sitting at the Council table. We're here representing the appellants in this matter, Brian and Marcy Wegerer, Ronald and Margaret McDermott, and Todd and Jane Nicholson. With respect to a ruling that was handed down August 31st, 2011, Henry County Circuit Court put an order resulting from that ruling, September 7th, 2011, by the Honorable Charles H. Stinkle. I'm confident, based upon past experience, the briefs have all been reviewed very carefully and studiously, so I'm going to go right to my argument, from the standpoint of a little bit of background, briefly. We've also brought a couple of pictures along to show, I believe, why we believe this judgment was an error and should be reversed. Totally in favor of the plaintiffs and requiring the defendants to remove the improvements that are existing on their lots 35 and 36. Turning to just a couple of matters, just for the Court's clarification. First of all, Exhibits 22 and 22A are the Timber Ridge Protective Covenants and the plat that was recorded years ago. And I'm sure the Court has those, but I'll be leaving that point. Second thing is that one of the issues that Judge Stinkle did not address, as far as setting anything aside, vagueness or anything like that, was the existence of the Architectural Control Committee. Many subdivisions, in fact most of them today that are platted, deal with some kind of a committee to make rulings with respect to questions that arise regarding the use of the property within that subdivision. That remained in place. Third is that on March 10th of 2010, the defendants did seek a variance approval with the Architectural Control Committee for Timber Ridge and that resulted in a decision March 25th of 2010. Exhibit number 31 is that document. I think the scope of the issues before the Court are contained in those documents. Timeline, I'll get to a couple of things later on, but I'd start with Exhibit number 102 to show you just proximity-wise as far as where the properties are located with respect to various plaintiffs. Lots 35 and 36 are, of course, the proofs and property depicted in all three photos, but you can see the house with the proofs and premises there. Right across the street in the view where it's taken from the picture is the McDermott property. That's lot number 29 as it views the proofs and property across the street. Both points in 43 and 156 exhibits are taken from that vantage point. Also, I would point out to the Court that Exhibit 103 also shows an aerial view of the proofs and property and might be of benefit to the Court. Now, these homes in Timber Ridge are all high-end value properties, but subject to the plat recorded, including the restricted covenants, it started with the 1st edition and went to the 2nd and the 3rd editions. Progressively, 2nd edition was recorded in 77. 3rd edition was August 10th of 1981. Dr. and Mrs. Perupson paid $560,000 for their home August 1st of 2001. The title policy and the documents that go with that clearly reflected it was subject to the existence of restricted covenants, the plat, everything was of record at that time. The trial judge made a very eloquent statement. He said at R-1238, people buy houses, they don't know about the restricted covenants, but that does not get them off the hook. That's the point of law, and that's what we're here for today is because if this Court permits the judgment of Judge Stengel to stand, basically there are no restricted covenants in effect from now on as far as that subdivision is concerned because he's basically gutted them by saying that they're vague and therefore necessarily unenforceable as a matter of law. I'm not dealing with 3.8 and the vagueness. That's a separation. That's what I'm going to address next. So what we did was I thought that the case would be clearly understood by the appellate tribunal better if I just bring a couple of pictures, which is the first time in my life I've ever put pictures in a brief. I've never, ever done that before, but I thought in this case, what's the old saying, 1,000 words? So I say 4,000 words, and you don't have to read those words. You just have to look at the pictures in my brief. So I started out with the situation thinking, why not bring a couple of enlargements of those photographs for the oral argument today so that I can make some points well known and a little more graphically than a small copy. Also, it's our opinion that the judgment Judge Stengel entered represented an absurd result as defined in the Rody case. That's our brief, page 34, citing that it can't result in an absurd. It just can't. That's not the way we interpret restrictive covenants in this country today, and therefore it should be reduced with the defendants enjoined and required to restore their property to the capacity that it existed in August of 2009. Taking a look now, if I may turn and make reference to Exhibit 43 first of all, so I don't lose all my papers and my composure, it's taken from the front yard of the McDermott premises, as you'll see right here. The McDermott property is right here. The McDermott's view from their front living room right across the street to the project that's in place at the McDermott premises. It starts at this point, and it goes all the way down. Now, the issue that I'm going to address primarily this afternoon is 3.8, substantial grade change. I can't believe that Judge Stengel would not have concluded the contrary, that there is a substantial grade change. You've got a 15-foot wall at this end in which they're building up an area of 129 by 110 in which to construct two tennis courts for playing services. When the project got started, Troy Lewis testified that this was a problem because they had to take some trees out, remove some trees, push trees back. But nevertheless, the restrictive covenant says clearly that they can't do this without seeking the approval of the Architectural Control Committee. At that time, the evidence shows very clearly they didn't know anything about Architectural Control Committee. They didn't know about the restrictive covenants. They didn't know about that until the later fall after they had done most of this work. So to that extent, it just doesn't read clear as far as good faith on behalf of the defendants. And remember the hook comment of Judge Stengel. You don't take the hook away just because you don't know about the restrictive covenants. They're a record. Everybody's living with them. And that's the protection in which we all live within subdivisions for protection amongst each other. So looking at that, then, if you'd follow initially the grass line, just to talk about the grade change, the grass line goes downhill. My hand's not as steady as it should be. You can see that very clearly. That proves the point also that when you deal with 3.8, it says no lot grade shall be substantially changed without prior written approval of the ACC. Well, the question is, of course, what's substantial? And we've gone through that in the briefing very deeply. We've had lots of cases we've given to you to show that, number one, in this case, those are 8-inch blocks. Each of them are 8 inches in diameter. So you're talking about 15 feet from the edge of this wall down to the bottom where they started to pull back or tow back in some of the dirt. To that extent, why there's no way that a person without a long ladder could even step down off that wall where it drops off into the ravine. Now, it's important to understand also from this view that the Nicholson property is directly to the right of this down through the ravine to the next property. So they look at this wall 129 feet long directly from the standpoint. It's also clear that there's going to be another 24 inches minimum of blocks added to the already 1,490 cubic yards of fill. I'm sorry, 1,527 yards of fill that's already in the premises. So it's 12 foot high today. It's going to become 15 feet. And defendants concur that they had to increase the lot grade at the ravine site to accommodate the 129 by 110 foot path. That was at Appelling's brief, page 15, first and second paragraphs both. Now, where the wall dies into the lot right here in the middle, it dies right down there. That's what we call in the briefing swale. That's going to take another 6 1⁄2 feet of fill just to bring it up to the level to make it compatible with the surface for the courts. And so you've got a lot more fill to come into the premises than what's already on there. It extends 129 feet deep going across that way, and it's 110 feet this way. The testimony is that this wall will eventually come almost to the house line to make the level for its surface to build the level up. Let me ask you, just assuming that there was, I don't know why anybody would do it, but is there anything in the covenants that would stop somebody if they just wanted to build a 14-foot wall around their property? Yes, there is. Is there anything erratic about privacy or something? Yes, there is. Which one? That's under 3.6 fences. That's one of the cited violations that we believe exists in the case. It says no fence or wall or hedgerow shall be permitted to extend nearer to the street than the residence itself. That was the disputed question of fact as far as does this wall. The first testimony was very clear, Your Honor, that the wall at this corner is closer to the street than the home. That's what the variance request was for on March 10th of 2010. When they supplied that, they said, let us build our house out closer to the street, therefore the wall won't be a violation of 3.6. That was denied. All right. And my question was inarticulately worded. I understand you're arguing about that, but aside from that, let's hypothesize that it was not closer to the street, moved it back 10 feet or however many feet it took to do that, and wanted to build a 14-foot wall around their backyard but no backhoe behind it. Anything in the covenant? They'd still have to seek the Architectural Control Committee approval. For a wall? Yes, for any construction that we read under the covenant language. If they call it a fence? If they call it a fence, it's not contained in 3.6. It just says it won't be closer to the street than the residence itself. But that's one of the four violations that occurred here that we tried the case over. What I'm addressing is the one that's clearest is the substantial grade change. So going up, may I proceed? I have a question about the grade. Is the initial grade, if you look at 156, on the backside of the wall, it appears that that ground is substantially higher than your marking of 12 foot. Because the trees are there, I'm assuming that that's not backfill, that that is the original grade. No, that's not correct. It was towed in. The testimony was clear from Mr. Lewis that he towed this wall in, and that's what this is being done right here. And he said at 152, he's bringing backfill back up to the wall and covered up several layers of blocks. Right there. How would that explain then for those trees to be there? Well, they dug out trees up to that line, but then they wanted to bring dirt back into it to avoid washage next to the wall, and that's what he testified he did. They called it towing in to the wall, to where they then brought up dirt right here. They're in the process of doing it right in this construct. This is one of Mr. Lewis' photographs that was taken during the job progress. It shows the dirt being brought back, in other words, to lessen erosion from where the wall has already been set down at a much lower level. So the wall has a base to it that is now, in this exhibit number 152, is covered up considerably. But you're saying that that is not, in fact, backfill, that that had never been there before. That that's not backfill, that that's not dirt that had been taken out so they could build the wall and then put back in. I don't know the answer to that question, but I know it's dirt that was pulled back up against the wall after the wall was constructed. The grade change... The grade was already in existence. It's more severe at that point. It went on down into the ravine. In order to get the playing surface, they needed to expand that and bring the wall up at that site to give the playing surface for the court. In picture number 43, the part that you called the swale, is that the original grade? Some of it might be right there, but you can see how the contour has not been filled at this site. So the original grade might be there. The original grade next to the house is about two feet below the house line. So you can see how the grade has sloped progressively in this lot. But in order to construct the two tennis courts in the premises that were provided, they had to raise the elevation. In other words, if you take the fill that has been added to this lot and you divide it amongst 109, 129 by 110, it would elevate the lot. It was perfectly level to start out with, 5.8 feet. That's how much fill has been put in. Okay, but it was a slope. It's a slope. Is that the slope? Well, you can see the slope. The original slope goes here outside the premises of the court. That shows you the contour. It drops, according to Mr. Lewis, anywhere from 6 to 7 feet to 13 to 14 feet in depth. He took site readings after he had started the process. He testified he couldn't take site readings in the beginning because there were trees in his way from where, right here, over on this line, there were trees that were removed initially. So he could not take readings because he couldn't read the sighting through the trees. So when you look at it, the exhibit number 118 showing the extent of the fill, when it's all done, we're going to have 5,500 tons, or 3,000 cubic yards, or 407 tandem dump truck loads of fill added to this lot. That's all in a 129- to 120-foot area. You'll have some rebuttal, Mr. Churchill. Thank you. Okay, thank you. Mr. O'Rourke. Thank you, Your Honor. May it please the court. Counsel. Your Honor, throughout this case, the plaintiffs have focused on four specific covenants within the Timber Ridge restrictive covenants. To support their request, the Paroopsons be forced to tear out the tennis courts that they started to build for their children. The district court, the trial court, Judge Stengel, listened to numerous witnesses, received dozens of exhibits, and reached a decision and held that none of these covenants prohibited the tennis courts. That decision is not against the manifest weight of the evidence, and that's the standard we're here to discuss today. One of the things that I noticed throughout the briefs and I heard again today was the comment that if the court permits this decision to stand, it will effectively gut the covenants. But that, in fact, isn't true. This decision was very case-specific based on the facts of this case. Judge Stengel did exactly what this court said years ago in the Engler case that we cited in our brief, a court should do. The court in Engler said, each case dealing with restrictive covenants should be decided on its own facts, that covenants should be strongly construed against the covenanter, and that all doubts should be resolved in favor of the natural rights and against restrictions. So the question here today is, was the trial court's decision against the manifest weight of the evidence? That's a very high threshold. Just as recently as two weeks ago, this court held that a decision is only against the manifest weight of the evidence if it is clearly apparent from the record that the trial court should have reached the opposite conclusion. Last month, Justice Schmidt, you wrote that a case is against the manifest weight of the evidence where all reasonable and unbiased persons would agree that the opposite conclusion is clearly evident. Well, the court can't reach that decision here. And that's what the trial court did. The trial court considered all of the evidence. The trial court weighed the credibility of the witnesses and reached its decision. The vast majority of the plaintiff's argument, I believe, is focused on Section 3.8, so that's what I'll talk about. And the language within that covenant does, in fact, say no lot grade shall be substantially changed without prior ACC approval. What is substantially changed? Well, the covenants don't define that. The plaintiffs called two of the original three developers to testify at trial. None of those developers provided any testimony or any evidence as to what constitutes substantially changed. None of them provided any evidence or any testimony about what they intended Section 3.8 to do at the time they filed these covenants some 30 years ago. So no evidence whatsoever as to what the purpose of Section 3.8 was. When we look at the rest of the covenants, the only other place we see a definition or a discussion about grade change is in Section 1.3, which allows an aggrieved party to seek restoration of grade for drainage purposes. This is not a drainage case. At no point in time did the plaintiffs ever contend that drainage was an issue here. The lot before the construction drained into the ravine. The lot after construction will drain into the ravine. It's been long held by this Court and by the Supreme Court that questions of witness credibility and conflicting evidence are matters for the trial judge. Here, the trial judge considered Contractor Lewis's testimony. Contractor Lewis testified that prior to the construction, there was a gentle slope that ran from the house towards the backyard. He prepared Exhibit 303 that was offered that demonstrates that slope. It was not until the property reached the timber line that it dropped off. Mr. Lewis explains that, in fact, he didn't really change the grade. The intent of the design was to tie in the existing grade to the project as much as possible. If anything, he said, we extended the grade a little bit. Covenants don't prohibit that. Now, the discussion about the tons and tons of fill and rock and all that that was brought into the property, one of the things that's important to keep in mind and not to overlook that the plaintiffs want to ignore is the fact that Contractor Lewis testified a lot of dirt was taken out. You can't build tennis courts directly on top of topsoil. They'll settle, they'll crack, they'll be no good. So he hauled dirt out, replaced it with fill so you can establish a steady base, much like you would see when they're building a road. You don't build cement roads right on top of dirt. You put in a base. So that's what he did. This is a two-acre lot, or two one-acre lots. The property itself is two acres. Judge Stengel considered that. He considered Mr. Lewis's testimony and concluded in the finding of fact that the lot was relatively flat to begin with and the lot will be relatively flat afterwards. He said the lot is basically flat. There might be a drop-off in grade, and there was to begin with, where it dropped off into the ravine. That was built up a little bit, but there's still a drop-off into the ravine. So essentially what the plaintiffs want you to do is second-guess credibility decisions, a credibility analysis by the trial court, and completely disregard Mr. Lewis's testimony, completely disregard the trial court's finding of fact, and instead accept wholesale the plaintiff's testimony. But that's not what the standard of evidence allows. That's not what the standard of review allows. In essence, it simply cannot be said that all reasonable and unbiased persons would agree that a conclusion opposite of what Judge Stengel reached is the only proper decision. Section 2.2 was the second basis that plaintiffs asserted to try and justify removing or forcing the defendants to tear out everything they've done and replace it. That's addressed very well in the brief. I won't beat the horse on that one because it simply refers to buildings. 2.2 applies by its own terms only to buildings. This project clearly is not a building. Justice Schmidt, you asked the question of plaintiffs' counsel about whether or not a wall could be built if it was within the perimeter of the house, so to speak. And simply put, there's nothing whatsoever in the covenants that says yes or no to that. The covenants do not require anyone to come in if they want to build a wall and do it on their own. There's nothing there that says that. Section 2.4 we addressed as well in our brief. This is the issue about et cetera. The question is, does this particular project fall within the vague word et cetera for purposes of that section? The trial court advised the parties in denying plaintiffs' motion for summary judgment that various provisions they relied upon were vague, this being one of them, and instructed the parties to the plaintiffs to present extrinsic evidence regarding what the developers intended these covenants to mean and to do when they filed them 30 years ago. Well, the only developer that offered any testimony about what et cetera meant for purposes of Section 2.4 was Mr. Peterson. The court considered Mr. Peterson's testimony, found him to be a credible, disinterested witness, and held that et cetera, based on Mr. Peterson's intent, did not include a tennis court. So this does not fall within Section 2.4. The court correctly pointed out Mr. Peterson was aware that tennis courts existed in high-end developments in the Quad Cities back at the time he filed these covenants. Mr. Peterson clearly could have included tennis courts if he wanted to, but he chose not to. And the reason he chose not to, according to the trial court and according to Mr. Peterson, was et cetera was meant to include things that technology had not yet invented, things that they had not yet thought of. He acknowledged tennis courts had been around for years. He acknowledged other developments that he had been involved with and that he knew of in the Quad Cities had tennis courts. He testified he did not intend to prohibit tennis courts in the Timber Ridge subdivision. There's no evidence and no basis to conclude that the trial court's conclusions on that issue were against the manifest way of the evidence. Finally, Section 3.6 is the fourth and final basis that the plaintiffs relied upon to try and convince the trial court to force the proofs and to tear out this project. And that's the one that deals, the counsel referred to earlier, that deals with walls extending nearer to the street than the residents. The difficulty in this particular case, as Judge Stengel correctly recognized, is how do you measure that? How is, where do you measure from? What is the process you follow? Again, the developers that were called to testify offered no opinion on this. They didn't testify as to what their intent was at the time that they filed these covenants. They didn't explain how they, as the developers who filed the covenants, thought you should measure this. They had no opinion on this issue whatsoever. The difficulty in this case is you have a house, the proofs of the house, that's on a quarter lot. This is the side of the house. This is the front of the house. If you have a house, for example, like McDermott's, that is not on a quarter lot but is simply on a straightaway like this, it's easy to tell if a fence is nearer to the street than the house. There's only one way to measure it, the house to the street. But when you have a corner lot, there's two ways to measure it. Do you measure it from the nearest point of the house to the nearest point of the street? That's one way to measure it. Do you measure it the way plaintiffs want to measure it, from everything from one side? In which case, some people in the subdivision can have a fence that extends to the side of their house, but other people can't. Well, the problem is when there's two different ways to measure something, when there's two different ways to interpret a covenant, the courts have held that you must interpret it in a way that least restricts the use of the land, exactly what Judge Stengel did here. The other is the final basis that we have set forth for affirming the trial court's decision is one that, frankly, the trial court did not get to because it didn't have to, and that's the affirmative defense we set forth of latches. The trial court did not get to the affirmative defense because it ruled in our favor on plaintiff's main case, for the reasons you're familiar with. But in this case, the court can affirm, as in any case, for any basis advanced below. The evidence at trial showed that this construction project went on and on and on with the plaintiffs watching it. Mr. McDermott sitting across the street observing the construction. Mr. Nicholson, Mr. Weger, aware that the construction is going on as early as September, sitting back, letting that much work be done, approximately $100,000 of work, never initiating suit, never saying they're going to file a lawsuit, never telling them to stop and, in fact, compound the problem when there was a meeting held by Mrs. Peruse at the House to address their concerns. Contractor Lewis specifically asked Mr. McDermott, are you telling us to stop? The answer, no, that's not what I'm telling you to do. They sat back and allowed them to build and build and build without doing anything, without initiating a lawsuit. The mere threat of a lawsuit is not enough. They were obligated under the case law we've cited in the brief to take affirmative action, to take legal action. They didn't do it. Peruse has continued to work based on those representations of no, we're not telling you to stop, and continued to build. Counsel, you have two minutes. Under those circumstances, it would not simply be equitable or fair to require the Perusians to tear out and spend another $30,000 to $35,000 to rip out what they've already done. Your Honors, that covers my argument. I would be happy to address any questions you may have. Let me just say the last argument you just made would go to certainly, I mean, in essence, there's two kinds of standards for review here. One of them would be is there a violation of the covenants, which is manifest weight. But then if we get to the point where the judge finds one and then whether or not he's going to issue an injunction, which is an equitable remedy, then that becomes discretionary. I believe that's correct, Your Honor. And then once you've found a violation, then the latches would apply to whether or not it was equitable to issue the requested injunction. I believe that's correct. And the reason Judge Stengel did not get to the latches argument is because he concluded that there was no violation of the covenants. Therefore, there was no need for him to get to that argument. So it only comes into play if there had been a determination that, in fact, the covenants had been violated. Your Honors, thank you for your attention today. Thank you. We would respectfully request that you affirm the district court and the trial court's decision. Mr. Churchill, some rebuttal? Yes, Your Honor. Concerning the last topic that you just addressed, the latches argument, you need to go back and realize that until October 22nd, there was never any discussion with anybody representing my clients as to what was intended to be built here. The project was already well underway. Sure, there were contractors coming into the property, but it's not their burden to find out what's going on there. Well, let me just ask you, assuming, for the sake of argument, that we found the trial judge's ruling against me to dissuade the evidence, and then because whether or not to issue an injunction is discretionary, wouldn't what we would do at that point be to remand the case to the trial court and say there is a violation, now exercise your discretion, now deal with whether or not you're going to issue an injunction? That's one of the alternatives, correct. That is correct. But from the standpoint, when you look at the dates involving that circumstance, August of 2009 is when they got started. That's when the first truckload, I believe, came in from Millers. The second thing is you're talking about then October 22nd, a meeting which the defendant doctor and Ron McDermott met in their yards and talked about. That's the first time they were ever told we're putting in two tennis courts. And the judge said they've ignored the elephant in the room, is the way he worded his opinion. True. From that standpoint, they were negotiating, they were talking about various alternatives. They talked about one tennis court, two tennis courts. So that needs to be recalled from the standpoint that good faith discussions were going on. And the other thing is McDermott didn't hire the contractor. He couldn't tell him, you stop. He didn't have authority to do that. The idea was from the meeting of November 22nd, when they first got a number, nobody knew about the covenants according to the plaintiff's or the defendant's side until that meeting occurred on the 17th when the letter came from the Timber Ridge Association. That's when the warning letter came to them saying, you're violating several of the covenants. We need a meeting. You've got to act now. That's what was done. So from that standpoint then, the contractor said, I just want to button it up. The judge said there was no need to button it up. McDermott was being used for a patsy by the contractor in that discussion, and that's what he said in his opinion. So I say that from the standpoint of gutting the covenants, counsel's comments aren't true. If this opinion stands, it does gut the covenants of Timber Ridge thoroughly from the standpoint because he said they're vague. He said they're unenforceable as a matter of law being vague, two of them, two of the four. So he addressed that. Also, the dirt was not removed. Stumps were removed. When you go back and look at the testimony, Troy Lewis said he had to haul stumps out. Now, I question common sense to the court. Is 2.15 miles of dump trucks, tandem dump trucks, bumper to bumper, is that substantial? That's what the distance would be for the 407 dump trucks of fill material brought into the job site. They sure didn't take that much fill out of the job site. So the substantial argument has to succeed, in my opinion, from the standpoint that it was a substantial grade change. If you look at Exhibit 103, which I believe is what counsel used also, this shows the terrain of the lot behind the house. Now, it's an aerial photo. You can't read depths, unfortunately, from that photograph. But it does show the tree line. Sure, they took stumps out. But they did reduce the lot line. As you look at the photograph here, 43, they reduced it two foot at the house to take away a little bit of improvement there. But it's building back up again because they take 6.4 feet and add to the swale. So the whole elevation came up, if you just did it on a level playing floor, 6.8 feet of added fill. So 407 yard tandem dump truck loads, that's a lot of fill, in my opinion. I mean, I used to drive a truck as a kid before law school days, et cetera. And I remember how much you could put in them. These are tandem dump trucks. These are not like what we used to use. So I say from that standpoint, good rhetoric, bad policy. To let this decision stand, however, is bad policy from the standpoint that it only takes one of these factors to rule that the case should be reversed. It takes any one of them. And I focused on the most clear is the substantial grade change. That's the one where there's not much doubt, in my opinion. And I go to what Justice Frank Easterbrook said, and we put it in the brief. It's not all but impossible to write a law or regulation without qualitative words such as substantial. And these words do not naturally prevent enforcement. The other thing is, in the Rodman decision around the Supreme Court in 1972, they defined substantial as essential, material, fundamental. Trial judge said that they had to raise the elevation of the court to build it. Well, didn't the trial judge say the highest level is any higher and the lowest level is any lower? A few feet. Pardon? He said a few feet. You've got 15 feet at one end. You've got two feet at the house end. That's sure not a few feet in my opinion, Your Honor. That's respectfully my opinion. That's what he said. All right. We respectfully request that the judgment of the circuit court in the county be reversed. An injunction granted against the defense. Thank you very much. Thank you, Mr. Churchill. Mr. O'Rourke, thank you. I thank all of you here. And the matter will be taken under advisement. A written disposition will be issued. Right now we'll be in brief recess for panel changes.